Arthur H. ODE, Jr., Plaintiff,

v.

Irvin OMTVEDT, The University of Nebraska–Lincoln, Charles Wilson, MD, Nancy O'Brien, MD, Margaret Robinson, Nancy Hoch, Robert Allen, John Payne, Don Blank and Rosemary Skrupa, The Board of Regents of the University of Nebraska, Defendants.

4:CV94–3196.

United States District Court, D. Nebraska.

April 26, 1995.

Robert E. Sutton, Milwaukee, WI, for plaintiff.

David R. Buntain, Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Arthur H. Ode, Jr. (Ode), who now lives in Wisconsin, previously worked at the University of Nebraska–Lincoln (UNL) as director of the Nebraska Statewide Arboretum (NSA). Ode claims that Defendants, especially Irvin Omtvedt (Omtvedt), vice chancellor of the Institute of Agriculture and Natural Resources (IANR) at UNL, harmed him by (1) terminating his employment because of age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621–634, (Filing 1 Compl. ¶¶ 7–13); (2) depriving him of a property right in continued employment without due process of law in violation of 42 U.S.C. § 1983, (Filing 1 Compl. ¶¶ 14–17); and (3) breaching his written employment contract by failing to renew it based upon false and pretextual reasons. (Filing 1 Compl. ¶ 18.)

Defendants have filed a motion for summary judgment, (Filing 12), claiming that (1) Ode's ADEA claim is barred because he failed to file a timely charge with the Equal Employment Opportunity Commission (EEOC); (2) there is no basis in fact for

Ode's ADEA claim since he was hired when he was over 50 years old by the same man who terminated his employment; (3) Ode's due process and contract claims are barred by a release he signed; (4) Ode had no property interest in continued employment; (5) even if Ode did have a property interest in continued employment, he received all the process due him; (6) Ode failed to assert the contract claim as required by the State Contract Claims Act; and (7) the relevant evidence establishes that Ode's contract was not breached.

I find and conclude that Defendants' motion for summary judgment should be granted because there are no material facts genuinely in dispute and because (1) Ode's ADEA claim is barred because (a) he failed to file a timely EEOC charge within 300 days of the date of the alleged unlawful action, and (b) Ode has failed in his burden of proof to establish a jury question on his entitlement to equitable tolling of the 300–day time period; (2) there was no due process violation since Ode had no property interest in continued employment; and (3) even if the reasons for nonrenewal of Ode's contract were false and pretextual, the contract was not breached because it unambiguously provided for expiration on a date certain and did not require renewal if Defendants gave timely notice of nonrenewal (which they did), recognizing that the contract also unambiguously provided that Defendants need not have cause for nonrenewal.[1]

## I.

I find and conclude that the following are the undisputed material facts of this case:

1. Plaintiff Arthur H. Ode, Jr., is an adult citizen of the United States and currently resides in Milwaukee, Wisconsin. (Compl. ¶ 3; Answer ¶ 1.) Ode holds a Ph.D. in public administration, with undergraduate degrees in botany. (Ode Dep., Ex. 14.)

2. Defendant University of Nebraska–Lincoln is a public university established by the State of Nebraska which provides higher education and has been organized pursuant to the laws of the State of Nebraska. Its administrative offices are located in Lincoln, Nebraska. (Compl. ¶ 5; Answer ¶ 1.)

3. Defendant Irvin T. Omtvedt was employed by UNL as the vice chancellor for IANR and as vice president for agriculture and natural resources throughout the University of Nebraska system during the period that Dr. Ode was employed at UNL. (Compl. ¶ 4; Omtvedt Dep. 5:14–7:2.)

4. The Board of Regents of the University of Nebraska (Board of Regents) is a body corporate and is responsible for the governance of the University of Nebraska. Neb. Rev.Stat. § 85–101 et seq. (Reissue 1994). During 1992 and 1993, defendants Charles Wilson, Nancy O'Brien, Margaret Robinson, Nancy Hoch, Robert Allen, Don Blank, John Payne, and Rosemary Skrupa were voting members of the Board of Regents. (Milliken Aff. ¶ 4.)

5. Dr. Ode was hired by Dr. Omtvedt to be the director of the Nebraska State Arboretum (NSA) in 1988. Dr. Ode began his employment on July 1, 1988. (Ode Dep. 8:22–9:1; Omtvedt Dep. 7:3–7.)

6. As director of the NSA, Dr. Ode had overall responsibility for a statewide arboretum with multiple sites around the state, most of which had volunteer curators. The position involved working with both the IANR within UNL and a board of directors of the NSA. The vice chancellor of IANR, Dr. Omtvedt, was responsible for supervising the director. (Omtvedt Dep. 8:12–9:1.) Dr. Ode directly supervised four staff members—an office manager, a curator, an educational director, and a position funded by the Kiewit Foundation to develop several arboreta sites on a partnership basis around the state. In addition, the director supervised approximately 30 volunteer curators at approximately 50 sites around the state. (Omtvedt Dep. 9:2–10:7.) Dr. Ode agreed that the duties of the position were as stated in a position description, attached as exhibit 11 to his deposition. (Ode Dep. 98:9–100:11.)

7. Under Nebraska law, the Board of Regents has the power to appoint faculty members and academic administrators and to provide for academic tenure of professors, asso-

---

1. I do not reach the other arguments advanced by Defendants as it is unnecessary to do so.

ciate professors, and assistant professors. Neb.Rev.Stat. § 85–106(2) (Reissue 1994).

8. Dr. Ode held a "special appointment" as a member of the "academic-administrative staff." The category of "academic-administrative staff" includes:

all faculty and such administrative officers as the Board may designate. The faculty of the University of Nebraska includes all persons holding the academic rank of assistant instructor and above, or formally approved equivalent ranks.

(Bylaws of Bd. of Regents § 3.1.1.1; Milliken Aff. ¶ 2; Ex. 1.) The Board of Regents' bylaws further define the term "special appointments" to include appointments to "all administrative and non-faculty professional staff positions." (Bylaws of Bd. of Regents § 4.4.1.) The bylaws provide that a "special appointment" will terminate:

in accordance with the time stated in the appointment to the position or in the written contract, and, if no time is stated in the appointment to the position or in the written contract, the appointment may be terminated by either party giving the other at least 90 days notice of the date of termination. Such appointments may also be terminated by the University for adequate cause, disability, bona fide discontinuance of a program or department, or extraordinary circumstances because of financial exigencies.

(Bylaws of Bd. of Regents § 4.4.1.)

9. When Dr. Ode was initially hired by Dr. Omtvedt, Dr. Ode was placed in a "nontenured" position. (Omtvedt Dep. 7:8–12.) In June, 1990, Dr. Ode and Dr. Omtvedt negotiated a written contract of employment, which is exhibit 6 in the Ode deposition. The pertinent portions of that contract of employment are as follows:

**Section 1. Term of Contract; Extension.** The term of this Contract shall be for a period of three (3) years beginning on the 1st day of July, 1990, and expiring at midnight on the 30th day of June, 1993. Thereafter this Contract shall be automatically extended for two (2) additional years; *provided, that the University may terminate this contract without cause as of July 1 of any year by giving Dr. Ode at least 12* *months advance written notice of such termination....*

**Section 3. Professional Staff Appointment Status, Fringe Benefits, and Terms and Conditions of Employment.** (a) The professional staff appointment status of Dr. Ode pursuant to this Contract shall be an all-year, full-time special appointment as a member of the Academic–Administrative staff of the University of Nebraska–Lincoln. He shall receive all of the fringe benefits of employment received by other members of the Academic–Administrative staff on all-year appointments.

(b) Dr. Ode's employment shall be subject to (1) the terms and conditions of employment for members of the Academic–Administrative staff as provided in Chapter III of the **Bylaws of the Board of Regents** and (2) the rights and responsibilities of the professional staff as provided in Chapter IV of the **Bylaws of the Board of Regents.**

(c) Without limiting the generality of the provisions of subsection (b) of this section, Dr. Ode's employment may be terminated by the Board during the term of this contract or any extension thereof for adequate cause, disability, bona fide discontinuance of the Nebraska Statewide Arboretum as a program of the University, or extraordinary circumstances because of financial exigencies.

(Ode Dep., Ex. 6 (emphasis added).)

10. Dr. Ode alleges that he was appointed as a graduate faculty member at UNL. (Compl. ¶ 8, Exs. 2, 3.) Dr. Ode was given "courtesy" faculty appointments in two academic departments at UNL, horticulture and forestry, which gave him certain privileges in those departments. (Ode Dep. 52:10–23.) He admits he was not a tenured faculty member and was never placed on a track which could lead to tenure, even though he twice requested to be placed on a tenure-leading track. (Ode Dep. 51:8–52:5.) Under § 4.4.1 of the Regents' bylaws, the term "special appointments" includes faculty appointments which are "courtesy appointments." (Milliken Aff. ¶ 2; Ex. 1 § 4.4.1.)

11. When Dr. Ode began work in 1988, the person who was responsible for his performance evaluations was Dr. T.E. Hartung, who was the associate vice chancellor of IANR. Prior to the 1992 evaluation Dr. Ode had received favorable evaluations from Dr. Hartung. (Compl. ¶ 9 and attached Exhibit 4.) In 1992, Dr. Omtvedt changed the procedure, due to restructuring within IANR brought on by budget reductions. Dr. Omtvedt took on the responsibility of performing the annual evaluation of Dr. Ode. Dr. Omtvedt's evaluation of Dr. Ode's performance for the year 1991 is attached as exhibit 13 to the Ode deposition. The evaluation was dated February 20, 1992, and was reviewed by Dr. Omtvedt with Dr. Ode in a meeting on March 3, 1992. (Omtvedt Dep. 12:14–17, 21:20–24; Ode Dep. 106:5–111:17.) In the evaluation, Dr. Omtvedt made a number of critical comments about Dr. Ode's performance and concluded by saying:

> This is the first time I have personally evaluated you since you got established in the position, but the feedback I received clearly indicates you need to provide stronger, more aggressive responsive leadership for NSA. There are many people who are anxious to help and are capable, but you are going to have to provide the leadership.

(Ode Dep. Ex. 13.)

Dr. Omtvedt went over the evaluation with Dr. Ode at their meeting and they talked about the various points in the evaluation. (Ode Dep. 106:5–25, 111:1–17.)

12. On June 11, 1992, Dr. Omtvedt notified Dr. Ode that he had decided to terminate Dr. Ode as director of the NSA. Dr. Omtvedt met with Dr. Ode that day and gave him a letter advising him of Dr. Omtvedt's decision. The letter is exhibit 4 in the Ode deposition. The letter states in pertinent part:

> As you know, your current contract as Director of the Nebraska Statewide Arboretum and Curator of the University of Nebraska Arboretum expires on June 30, 1993. After carefully evaluating the wide range of input I received from the IANR Administrative Council, NSA Board members, NSA staff, and some NSA members,

> I regret to inform you that we are not in a position to renew or extend your contract beyond June 30, 1993. In accordance with the terms of your contract with the Board of Regents of the University of Nebraska, we are hereby notifying you that your contract will terminate on June 30, 1993.

> Art, I regret the necessity to provide you with this termination notice since you have considerable professional expertise to offer an arboretum program. It is unfortunate that there is not a better match between your personal leadership skills and the current NSA priorities. Since I respect and value your professional expertise, I would be pleased to provide a positive reference for you as you explore other employment opportunities.

(Ode Dep., Ex. 4; *see also* Ode Dep. 38:1–39:18.)

13. As soon as he received the notice of termination Dr. Ode concluded that he was the victim of age discrimination. (Ode Dep. 16:11–25.) After being notified of his termination, Dr. Ode consulted with an attorney regarding nonrenewal, particularly regarding whether Ode had "grounds for an unfair labor practice suit or other course of action." (Ode Dep., 22:10–15.) Ode then wrote a response to Dr. Omtvedt's June 11 letter on July 10, 1992. Dr. Ode's response is exhibit 2 to the Ode deposition. After disagreeing with Dr. Omtvedt's evaluation, Dr. Ode made the following request:

> I am hopeful that you will give me a "positive reference" in a form that would allow it to be submitted as a performance evaluation. In fact, it is my hope that the February 20th, 1992 evaluation by yourself could be removed from the files. Thus, I could submit as my last performance evaluation the January 29th, 1991, evaluation by Dr. Hartung.

(Ode Dep., Ex. 2; *see also* Ode Dep. 23:17–25:17.)

Dr. Omtvedt responded by writing a letter to "Whom It May Concern," dated August 7, 1992, in which he provided a reference for Dr. Ode. (Ode Dep., Ex. 5.) Among other things, Dr. Omtvedt's letter described budget cuts facing the IANR and his need to reduce

administrative costs and to minimize budget cuts in priority program areas. According to Dr. Omtvedt's letter:

Considerable salary savings could be obtained by restructuring the NSA unit within the University of Nebraska by reclassifying the director position as a managerial/professional position, rather than as an academic/administration position. We have concluded that the end of the current contract (for Dr. Ode) would be the most desirable time to consider these cost-saving measures.

(Ode Dep., Ex. 5.)

14. As indicated in the letter from Dr. Omtvedt to Dr. Ode notifying him of his termination, Dr. Ode was given the option to work through the expiration of his contract on June 30, 1993. In April, 1993, Dr. Omtvedt decided that it would be in the best interest of the University for Dr. Ode to leave as director of the NSA. On April 9, 1993, Dr. Omtvedt talked with Dr. Ode by telephone and indicated to Dr. Ode that it was Dr. Omtvedt's desire that he vacate his office. Later that day, Dr. Omtvedt sent Dr. Ode a letter concerning the terms and conditions of his departure, which Dr. Ode read and signed. The pertinent portions of Dr. Omtvedt's letter are as follows:

This letter serves to acknowledge your agreement with the University of Nebraska that you will no longer provide services as Director of the Nebraska Statewide Arboretum after 11:59 p.m. April 9, 1993. The University of Nebraska agrees to pay your salary and benefits equal to the rate of compensation paid you as of April 9, 1993, through June 30, 1993....

If you agree to the above conditions and agree to release the University of Nebraska from any further claims of compensation or other claims related to your employment with the University, please sign below.

(Ode Dep., Ex. 7; see also Ode Dep. 67:7–74:13.)

15. After Dr. Ode was notified of his termination on June 11, 1992, he did not pursue any grievance within the University. As a member of the "academic-administrative staff," (see ¶ 8, supra ), Dr. Ode had the right to file a grievance before the Faculty Grievance Committee of the UNL. The bylaws of the Board of Regents give the faculty governance agency of each major administrative unit of the university the power to create a faculty grievance committee which is empowered "[t]o consider a complaint filed by any faculty member alleging any grievance." (Bylaws of Bd. of Regents §§ 4.13.1, 4.13.2; Milliken Aff. ¶ 2, Ex. 1.) At the time Dr. Ode was terminated, the Faculty Grievance Committee of UNL had in place rules of procedure to consider grievances brought by staff members such as Dr. Ode. (Milliken Aff. ¶ 3, Ex. 2.)

16. Other than asking Dr. Omtvedt for a more favorable reference letter, (see ¶ 13, supra ), the only person within UNL whom Dr. Ode contacted about his termination was Dr. Graham Spanier, chancellor of UNL. Dr. Ode wrote a letter to Dr. Spanier, dated January 4, 1993, in which he raised objections to the potential restructuring of the NSA. (Ode Dep., Ex. 3.) Dr. Ode's letter to Dr. Spanier stated:

I am not pleading to be retained as Director of NSA. If that were my intent I would have done so last June when I was told that my contract would not be renewed (I do not hold tenure). I would consider staying on if asked, but I have no desire to be where I am not welcome.

Dr. Ode chose not to file any grievance with the university challenging his termination. (Ode Dep. 29:19–25.)

17. On February 18, 1994, Dr. Ode filed a claim of age discrimination with the United States Equal Employment Opportunity Commission. (Compl. ¶ 14.) A copy of the affidavit which he filed in support of his charge is attached as exhibit 8 to his complaint.

18. Dr. Ode was born on November 17, 1936. (Compl. ¶ 7.) At the time he was hired by Dr. Omtvedt, Dr. Ode was 51 years old, and at the time he was notified of his termination by Dr. Omtvedt, Dr. Ode was 55 years old.

19. Dr. Omtvedt was born on June 12, 1935. (Omtvedt Dep. 5:16–17.) At the time Dr. Ode began his employment at UNL, Dr. Omtvedt was 53 years old, and Dr. Omtvedt

notified Dr. Ode of his termination the day before Dr. Omtvedt's 57th birthday.

20. Dr. Ode has no direct evidence that Dr. Omtvedt's decision to terminate him was motivated by Dr. Ode's age. He has not had any conversation with anyone within the university that would suggest that age was a factor in the decision to terminate his contract. (Ode Dep. 45:14–18.)

21. After Dr. Ode was notified of his termination on June 11, 1992, Dr. Omtvedt was faced with another budget cut in IANR, which forced him to cut approximately $700,-000 from his budget. Dr. Omtvedt discussed the situation with the board of directors of the NSA, who advised him that they felt they needed someone as the new director who would be more of a "hands-on" administrator and that the university could hire someone at a lower salary. Dr. Omtvedt later proposed to the chancellor that the director's salary be cut about $30,000. The university advertised to fill the vacancy at this lower salary level. (Omtvedt Dep. 37:1–16.) The new position was advertised as requiring a master's degree, but with a Ph.D. preferred. The university advertised the position, received 33 applications, and interviewed 6 finalists. Of the 6 finalists, only one had a Ph.D. (Omtvedt Dep. 37:17–38:3.)

22. Dr. Omtvedt hired James Locklear as the new director of the NSA. Mr. Locklear did not hold a Ph.D. Mr. Locklear was 38 years old when he was hired. (Omtvedt Dep. 38:4–13.) Dr. Ode became aware that Locklear had been hired sometime in December of 1993. (Ode Aff. ¶ 23.)

23. When the university readvertised the directorship of the NSA with new responsibilities, minimum requirements, and a reduced salary, Dr. Ode was eligible to apply. (Omtvedt Dep. 38:14–39:10.) Dr. Ode did not apply, but he claims, and I assume, that he was not offered the position. (Ode Aff. ¶ 24.)

24. Dr. Ode contends there are two facts which indicate that he was a victim of age discrimination. First, he contends that he was replaced by a younger man. Second, he contends that Mr. Locklear was hired into the same position which he held. (Ode Dep. 18:11–23.) Dr. Ode admits that he is not

contending that the decision was made to cut the NSA budget before he was notified of his nonrenewal. (Ode Dep. 36:3–11.) Dr. Ode was not involved in the decision to restructure the NSA and reduce the budget and does not know when that decision was made. (Ode Dep. 43:14–20.)

## II.

As noted earlier, Defendants' motion for summary judgment should be granted because there are no material facts genuinely in dispute and because (1) Ode's ADEA claim is barred because (a) he failed to file a timely EEOC charge within 300 days of the date of the alleged unlawful action, and (b) Ode has failed in his burden of proof to establish a jury question on his entitlement to equitable tolling of the 300–day time period; (2) there was no due process violation since Ode had no property interest in continued employment; and (3) even if the reasons for nonrenewal of Ode's contract were false and pretextual, the contract was not breached because it unambiguously provided for expiration on a date certain and did not require renewal if Defendants gave timely notice of nonrenewal (which they did), recognizing that the contract also unambiguously provided that Defendants need not have cause for nonrenewal.

I turn to those issues next.

### A.

Under the ADEA, no civil action may be commenced until after a charge of unlawful discrimination has been filed with the EEOC, and "such charge shall be filed ... within 180 days after the alleged unlawful practice occurred...." 29 U.S.C. § 626(d)(1). However, the law also provides that the charge may be filed within 300 days of the alleged discrimination if the claim is being asserted in a state that has an agency capable of providing age discrimination relief, or within 30 days following receipt by the grievant of a notice of termination of state proceedings, whichever is earlier. 29 U.S.C. § 626(d)(2).

■ If the charge is not timely filed, and if there is no equitable basis upon which to forgive the lack of a timely charge, the courts

treat the failure to timely file the same as missing a statute-of-limitations date and, consequently, dismiss the suit. 1 Howard C. Eglit, *Age Discrimination* § 6.08, at 6–34–38 (2d ed. 1994) ("Such a failure will constitute a determinative basis for a court's granting of a defendant's motion to dismiss or motion for summary judgment."); 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(a), at 21–242–44 (1994) (collecting cases, including *Nielsen v. Western Elec. Co.,* 603 F.2d 741 (8th Cir.1979)).

■ There are two reasons for requiring relatively strict compliance with the filing deadlines: (a) timely filing provides the EEOC with an opportunity to conciliate the complaint while it is still fresh; and (b) timely filing provides early notice to the employer, thereby promoting both the preservation of evidence and good faith negotiation on the part of the employer during the conciliation period. *See, e.g.,* 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(a), at 21–241 (footnotes omitted).

In this case, Nebraska has a state agency capable of providing relief for an age discrimination claim. 29 C.F.R. 1626.9(b) (1994).[2] Thus, Ode had 300 days within which to file his discrimination charge with the EEOC. *See, e.g., Agostine v. Iowa Beef Processors,* 1984 WL 48984, 35 FEP Cases 328 (D.Neb. 1984) (age discrimination charge timely filed when it was filed with EEOC within 300 days of alleged age discrimination, notwithstanding the fact that NEOC had no record of such a filing with state agency); 1 Howard C. Eglit, *Age Discrimination* §§ 6.08, at 6–42–43, 6.27 at 6–164–66; 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.22(c), at 21–272–73 & n. 43, 102.22(d) at 21–273–276.1. Accordingly, the question in this case is whether Ode filed his charge within 300 days after the "alleged unlawful practice occurred," and if not, whether there is some reason to excuse the tardy filing. I turn to those issues next.

## 1.

I shall first examine the question of when the "alleged unlawful practice occurred . . ."

for purposes of determining when a charge had to be filed pursuant to 29 U.S.C. § 626.

It is undisputed that Ode's EEOC charge was not filed until February 18, 1994, which was (a) 20 months after the June 11, 1992, notice of nonrenewal, and (b) more than 10 months (313 days) after the April 9, 1993, agreement between Ode and UNL that Ode would stop work that day but receive his full salary computed through June 30, 1993. On the other hand, it is also undisputed that Ode filed his EEOC charge within 300 days if his action accrued when his contract otherwise terminated on June 30, 1993. The question is on which of these three possible dates the "alleged unlawful practice occurred."

■ I conclude that this case is controlled by *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and that the time for filing the EEOC charge began to run when Ode was unambiguously notified in writing in June, 1992, that his contract would not be renewed. The *Ricks* ruling addressed the Title VII analogue to the ADEA filing requirement.

In *Ricks,* a college professor alleged that he was denied tenure because of his national origin. The professor was informed of the denial of tenure by letter dated June 26, 1974. However, the letter granted the professor a one-year teaching contract, at the expiration of which, on June 30, 1975, his employment with the institution would end. The *Ricks* opinion held that the time period for filing the charge began to run from the date the tenure-denial decision was communicated to the professor, not from the date on which his employment ended.

■ As a result, "[s]ince *Ricks* lower court ADEA decisions have left no doubt that this Supreme Court ruling applies, by way of analogy, in the age discrimination context." 1 Howard C. Eglit, *Age Discrimination* § 6.10, at 6–47 (footnote and citations omitted). Thus, the courts have consistently held that "the time for filing a charge of unlawful discrimination under the Age Discrimination in Employment Act (ADEA) begins to run *when the grievant is informed of the allegedly adverse action or decision.*" *Id.,* § 6.11,

---

**2.** So does Wisconsin, where Ode was living when he filed his charge with the EEOC. *Id.*

at 6–50 (footnotes and citations omitted) (emphasis added). *See also* 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(b), at 21–246–47 & n. 60 ("[N]early all cases brought under the ADEA have followed the rule enunciated in *Ricks: the period for filing a charge begins to run from the date that the employee is notified of the adverse employment action.*") (citing, among other cases, *Mogley v. Chicago Title Ins. Co.*, 719 F.2d 289 (8th Cir.1983)) (emphasis added). Thus, it is not when the plaintiff "discovers" that he or she has a cause of action that triggers the charge-filing requirement under the ADEA. Rather, the filing time is triggered when the statutory "occurrence"—an unequivocal employment decision—is communicated to the employee. *Hamilton v. 1st Source Bank*, 928 F.2d 86, 87–88 (4th Cir.1990) (en banc).

■ Unless there is some equitable reason to excuse Ode's failure, I must therefore grant Defendants' motion for summary judgment regarding the ADEA claim because no charge was timely filed within 300 days of the unequivocal[3] June 11, 1992, notice of nonrenewal.

### 2.

■ Because an untimely charge has been determined by Congress not to be a jurisdictional failure, 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(a), at 21–243–244 n. 53 (citing Joint Explanatory Statement of Comm. of Conference, H.R.Rep. No. 950, 95th Cong., 2d Sess. ·12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 528, 534), in certain circumstances the courts have applied equitable principles to excuse a charge not filed on a timely basis. *Id.* at 21–244 n. 54 (collecting cases).

■ However, the plaintiff has the burden to establish a "factual basis" for excusing the untimely filing. 1 Howard C. Eglit, *Age*

*Discrimination* § 6.17, at 6–103–04 (citing, among other cases, *Conaway v. Control Data Corp.*, 955 F.2d 358, 362 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 186, 121 L.Ed.2d 131 (1992)). Thus, when a plaintiff ADEA claimant has missed the charge-filing deadline, he or she must present sufficient facts to make a triable issue on the question of equitable tolling, or a trial court must grant a defendant's motion for summary judgment. *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1265–66 (8th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991) (collecting cases where summary judgment was granted on equitable tolling claims in ADEA cases). I turn next to Ode's justification for the late filing.

Ode argues that the charge-filing period should be tolled because he did not learn that a younger man had been hired until December, 1993. (Pl.'s Br.Opp'n Mot.Summ.J. at 4.) I assume for purposes of the motion for summary judgment that Ode did not learn that a younger worker had been hired until December, 1993. However, that is not enough to create a jury question.

■ Although the belated discovery that a younger worker has been employed to replace an older one may toll the charge-filing period under certain circumstances (such as where the employee reasonably does not suspect discrimination until the younger person is hired), *see, e.g.*, 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(e), at 21–258–259 (citations omitted), the pertinent question is not when knowledge of a replacement worker's age is first discovered. Rather, the facts possessed by the grievant need (1) "only be enough to support the filing of a charge with the Equal Employment Opportunity Commission (EEOC)," and (2) be "sufficient to alert him or her to the possibility that wrongful discrimination existed." 1 Howard C. Eglit, *Age Discrimination*

---

**3.** Ode's counsel notes in passing that "Dr. Omtvedt held out a slim hope to Dr. Ode that this decision could be changed." (Pl.'s Br.Opp'n Mot.Summ.J. at 3.) Even if that were the case, it is irrelevant. The nonrenewal notice was in writing, and it was clear and unequivocal. Consequently, "the possibility that the adverse decision might be reversed does not negate its being the trigger for starting the running of the filing

period." 1 Howard C. Eglit, *Age Discrimination* § 6.11, at 6–51 (citing *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)). There is simply no evidence that Defendants tried to lull Ode into a sense of complacency, and there is no evidence that Ode was lulled into a sense of complacency.

§ 6.11, at 6–50–51 (citation omitted). *See also* 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(e), at 21–260 n. 8 (citing, among other cases, *Eubanks v. Harvard Indus.*, 889 F.2d 1092 (8th Cir.1989) (tbl.), *aff'g* 712 F.Supp. 146, 148–49 (E.D.Ark.1989)) (where an older woman was laid off, the court held that the period for filing an age discrimination charge would not be tolled on grounds that older woman did not learn younger woman had not been laid off until after the time for filing an EEOC charge had elapsed).

■ Thus, if the facts possessed by the grievant are sufficient to satisfy the foregoing two elements, a prospective plaintiff has an obligation to timely file an EEOC charge, and "the fact that some relevant evidence was initially unknown to the grievant will not justify tolling the running of the charge-filing period...." 1 Howard C. Eglit, *Age Discrimination* § 6.11, at 6–50–51. Stated differently, a grievant is not permitted to "wait until he or she has information rising to the level of what would be needed to constitute a prima facie violation of the ADEA." *Id.*, § 6.12, at 6–57.

■ The evidence establishes beyond dispute that at or about the time he received the letter of nonrenewal, Ode possessed facts which admittedly alerted him to the possibility that he had been wrongly discriminated against because of age, and the facts he possessed were sufficient to file a charge with the EEOC.

Ode admitted that from the moment he was handed the letter of nonrenewal, he concluded that age discrimination was the motivation for nonrenewal. When asked during his deposition, "When did you first come to the conclusion you had been a victim of age discrimination?" Ode stated, "[W]hen my contract was not renewed," and then lapsed into a nonresponsive answer. (Ode Dep. 14:21–16:3.)

■ Counsel for Defendants had the question read back and asked, "Do you understand the question?" to which Ode replied, "Yes." (*Id.* 16:9–10.) Defendants' counsel then asked, "What is the answer to that question?" and Ode replied:

When I walked out of the office [after receiving the nonrenewal letter] and said to myself I'm a victim here, why am I a victim? And then I started to think, what can it possibly be? It's budget.

And if it's budget why is it me? It's me because I'm too old. And they pay me too much money because I have too much experience and they've given me too many raises and I'm out. And that sounds to me like age discrimination.

Now, I wasn't a lawyer, that's what went through my mind. But I didn't take any direct action on that as far as an age discrimination case is concerned because they hadn't hired anybody to replace me. How could I say it was age?

(Ode Dep. 16:11–25.)[4]

Moreover, Ode knew at the time of nonrenewal that UNL intended to hire someone at a much-reduced salary. Indeed, Ode testified it was public knowledge because of three newspaper articles "that I would be replaced by some person who would make at least $30,000 less." (Ode Dep. 80:13–23.) This knowledge prompted Ode to write a letter to the chancellor of UNL in January, 1993, stating that while he was "not pleading to be

---

4. Despite the fact that Ode testified he concluded he had been the victim of age discrimination *"when* my contract was not renewed" and *"when* I walked out of the office,"* Ode subsequently contradicted his prior testimony without explanation. In an affidavit filed after his deposition was taken and after Defendants' motion for summary motion was filed and briefed, Ode stated it was not until December, 1993, when he learned a younger man had been hired, that he realized he been the victim of age discrimination. (Filing 15 ¶ 23.) Ode does not endeavor to explain his inconsistent deposition testimony. Without a convincing explanation for the blatant inconsis-

tency between Ode's affidavit and his deposition testimony—and there is none—Ode's affidavit attempting to contradict his prior answers to clear and unambiguous deposition questions will not be allowed to create an issue of material fact precluding the granting of summary judgment. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658–59 (11th Cir.1984); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–66 (8th Cir.1983). This ruling is particularly justified where, as here, the plaintiff bears the burden of establishing some factual justification for tolling the charge-filing deadline.

retained as Director of NSA," he objected to the restructuring of the director's position and the related "drastic budget reductions" imposed by the vice chancellor. (Ode Dep., Ex. 3.)

Moreover, Ode obviously knew he had received favorable evaluations prior to his 1992 evaluation. He also obviously knew he was in a protected class.

With the information in his possession when he received the notice of nonrenewal, Ode could have reasonably asserted to the EEOC that (a) his contract was not being renewed; (b) he was in a protected class; (c) according to his employer's evaluations he had performed his job satisfactorily in the past, save for the last evaluation received immediately prior to nonrenewal of his contract; (d) his employer was purportedly restructuring the job he was performing, while endeavoring to hire someone to perform that restructured job at a substantially reduced wage; and (e) as a consequence of these facts, he believed he was the target of age discrimination.

This information clearly constituted a sufficient charge under the EEOC guidelines. Indeed, EEOC regulations provide that a charge is adequate if it simply names the prospective respondent and generally describes the discriminatory act. 29 C.F.R. §§ 1626.6, 1626.8(b) (1994). *See also* 1 Howard C. Eglit, *Age Discrimination* § 6.04, at 6–13–17; 3A Arthur Larson & Lex K. Larson, *Employment Discrimination* § 102.21(c), at 21–253–257. And it is beyond dispute that "[t]he charge, whatever the format used, is not, and need not be, equivalent to the statement of a prima facie case, and so the charge need not meet the requirements

of the prima facie case."[5] 1 Howard C. Eglit, *Age Discrimination* § 6.04, at 6–14–15 (footnote omitted).

In summary, because the record is undisputed that at the time he received the notice of nonrenewal Ode possessed facts which alerted him to the possibility that he had been discriminated against because of age, and because he also possessed facts sufficient for an EEOC charge, Ode cannot excuse the tardy filing of his charge on grounds that he did not know a younger man would be hired.[6]

**B.**

I next review Ode's argument that he was denied a property right without due process of law. The question is whether, given the undisputed facts, Ode possessed a property right in continued employment after June 30, 1993.

■■■ "An employee must show a property interest in continued employment to assert a § 1983 claim for violation of constitutional due process." *Couch v. Wilkinson,* 939 F.2d 673, 674 (8th Cir.1991) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Property interests are not created by the Constitution, and in order to possess a property interest, the claimant must have a legitimate entitlement to the property interest, not merely an abstract need or desire for the interest. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). This typically means that a property-interest claimant must show either a contractual or a regulatory (statutory) basis for his or her claim. *Blankenbaker v. McCook Pub. Power Dist.,* 940 F.2d 384, 385 (8th Cir.1991).

**5.** After all, a timely EEOC charge permits the EEOC to conciliate the charge before the positions of the parties irretrievably change. Allowing a prospective ADEA plaintiff the opportunity to delay the filing of a charge until he or she has a prima facie case detracts from the statutory goal of providing the EEOC with an early opportunity to conciliate age discrimination disputes.

**6.** Ode does not contend that he was unaware of his legal rights. He has no factual basis for such an assertion in any event. Ode holds a Ph.D. in public administration, works in a relatively senior management position, and has, by his own

account, "thirty years of high level administrative experience." (Ode Dep., Ex. 3.) Thus, Ode had both the education and experience to understand his rights under the ADEA. Moreover, Ode consulted a lawyer immediately after receiving the nonrenewal letter, inquiring particularly whether he had "grounds for an unfair labor practice suit or other course of action." (Ode Dep. 22:10–15.) As a consequence, the record establishes that Ode had access to legal advice regarding the remedies that might be available to him for what he then viewed as an age-motivated adverse employment decision.

 The following facts are undisputed in this case: (1) Ode had a written contract unambiguously providing him with employment for three years on an "all-year, full-time special appointment as a member of the Academic–Administrative staff of the University of Nebraska–Lincoln"; (2) the contract unambiguously provided that it expired on June 30, 1993; (3) the contract unambiguously provided that it would be automatically renewed unless a notice of nonrenewal (termination) was given 12 months in advance of the renewal date; (4) the contract unambiguously provided that UNL could elect not to renew (terminate) the contract "without cause"; (4) by virtue of a letter dated June 11, 1992, Ode was given unambiguous and unequivocal written notice that the contract would not be renewed (and was terminated) effective June 30, 1993; and (5) UNL bylaws, (§ 4.4.1), provide, among other things, that a "special Appointment" terminates in accordance with the time stated in the written contract.

Based upon the foregoing undisputed facts, it is clear that Ode had no contractual interest in continued employment after June 30, 1993, because his contract explicitly provided that it could be terminated without cause if advance written notice was given. Since advance written notice was given in accordance with the contract, the contract was satisfied and Ode had no contractual interest in continued employment.

Likewise, because Ode's contract provided for termination on June 30, 1993, UNL by-laws provided that his "special appointment" employment would cease when the contract ended. Thus, when the contract was terminated in accordance with its terms, Ode had no property interest in continued employment which could be derived from the by-laws.[7]

Ode contends he had a legitimate expectation of continued employment that derived from section 4.7.1 of the UNL bylaws.[8] Among other things, that section of the by-laws provides that a " 'Special Appointment' may be terminated prior to the expiration of the stated term . . . only for adequate cause." (Milliken Aff.; Bylaws § 4.7.1.) Ode argues that he was terminated prior to the stated term of his contract, and since UNL had no "cause" for the termination, he had a property interest in continued employment pursuant to section 4.7.1 of the bylaws.

The obvious difficulty with Ode's contention is that it ignores the uncontroverted fact that his contract was not terminated prior to the expiration of its stated term. Rather, the undisputed evidence establishes that the contract was not renewed and was terminated in accordance with its unambiguous contractual provisions; the nonrenewal/termination was effective on the "expiration of the stated term" of the contract and not before. The fact that UNL gave notice of nonrenewal and termination 12 months prior to the expiration date *as called for in the contract* does not mean that the contract was terminated prior to its stated expiration date.[9] Accordingly, I find and conclude that section 4.7.1 of

---

7. Ode received a "courtesy" appointment to the departments of forestry and horticulture at the time he was hired. (Ode Dep. 52:10–17.) He concedes that he was not placed in a tenured or tenure-track faculty position. (Ode Dep. 51:8–52:5.) When asked what the role of these appointments was, Ode stated, "Just that. Courtesy." (*Id.* at 52:18–20.) Ode had no responsibilities as a result of these appointments. (*Id.* at 52:21–23.) Essentially, the appointments provided Ode with "invitations to seminars," "newsletters," and "that sort of thing." (*Id.* at 53:5–9.) It is clear that these "courtesy" appointments were part of the "special appointment" Ode received pursuant to his contract, and they ended when the contract was not renewed. Thus, Ode had no legitimate expectation of continued employment because of the "courtesy" he was extended.

8. Ode does not contend that because he could have taken advantage of UNL's grievance procedure even though he had no expectation of continued employment the grievance procedure somehow created a property interest. Such a claim would be unavailing in any event. *Stow v. Cochran,* 819 F.2d 864, 867–69 (8th Cir.1987) (the grievance procedure must create an expectancy of continued employment, not merely an expectancy of review of termination, before such a procedure will be construed to establish a property right).

9. It is also irrelevant that Ode vacated his office prior to the expiration of the contract's stated term since he was paid his salary and benefits through the stated term as evidenced by the written agreement of the parties dated April 9, 1993.

the bylaws is irrelevant to the facts of this case, as a plain reading of that section quickly reveals.

In summary, I find and conclude that the undisputed facts of this case establish that Ode had no property interest in continued employment after June 30, 1993, when his contract expired as a result of nonrenewal.

## C.

Ode asserts a breach of contract claim in his complaint.[10] However, Ode did not brief the assertion by Defendants that there is no *relevant* evidence that UNL breached the contract. Ode evidently believes UNL breached his contract in two ways: (1) by failing to extend the contract for an additional two years based upon reasons for termination that were false and pretextual; and (2) by breaching "the implied covenant of good faith between the parties" because of the false and pretextual reasons for termination. (Compl. ¶ 18.) I am not persuaded. Even if I assume that the factual predicate for Ode's argument is true, i.e., the reasons for his termination were false and pretextual, Ode has no contract claim under Nebraska law.

First, it is undisputed that the contract in question unambiguously provided that it could be terminated and not renewed "without cause." Thus, even if the reasons proffered for the termination were false and pretextual, as alleged by Ode, UNL was not obligated to renew the contract in any event. As a result, the reasons for Ode's termination are simply irrelevant. *See, e.g., Blair v. Physicians Mut. Ins. Co.*, 242 Neb. 652, 657, 496 N.W.2d 483, 486 (1993) (where employment contract was an "at-will" contract, reasons for termination were irrelevant).[11]

Second, Nebraska law does not recognize an "implied covenant of good faith or fair dealing" in employment termination cases such as this. *See, e.g., Jeffers v. Bishop Clarkson Memorial Hosp.*, 222 Neb. 829, 833, 387 N.W.2d 692, 695 (1986) ("Except in cases where an employee is deprived of constitutional or statutory rights or where contractual agreements guarantee that employees may not be fired without just cause, the law in this state continues to deny any implied covenant of good faith or fair dealing in employment termination.")

As a result, even assuming that the reasons for terminating his contract were false and pretextual, Ode has no contract claim under Nebraska law since it is uncontroverted that UNL complied with the contract by giving timely notice of nonrenewal as required by the contract.

Accordingly,

IT IS ORDERED that:

(1) Defendants' motion for summary judgment (Filing 12) is granted;

(2) Judgment shall be entered by separate document, stating that "judgment is entered for Defendants and against Plaintiff, providing that Plaintiff shall take nothing and Plaintiff's complaint is dismissed."

---

**10.** The parties have assumed that Nebraska law applies to Ode's contract claim, and so have I.

**11.** I note that Nebraska does not recognize a tort action premised upon allegations of malicious termination. *Id.*, 242 Neb. at 658, 496 N.W.2d at 487 (citing *White v. Ardan, Inc.*, 230 Neb. 11, 15, 430 N.W.2d 27, 30 (1988)).